J. T. ARNOLD D/B/A AGGREGATES & TRANSPORTERS ET AL *v.* KOEHRING COMPANY D/B/A BUFFALO-SPRINGFIELD CO.

5-4225                                              415 S. W. 2d 552

Opinion delivered June 5, 1967

*Gaughan & Laney,* for appellants.

*W. J. Walker* and *Wayne Foster,* for appellees.

CARLETON HARRIS, Chief Justice. J. T. Arnold, doing business as Aggregates and Transporters, was a subcontractor under the principal contractor, W. R. Fairchild Construction Company, Ltd. The latter company held a contract with the Highway Department to reconstruct a portion of Highway No. 167 in Dallas and Grant Counties. Under the contract, Arnold was to place about 200,000 cubic feet of dirt on both sides of the road, across the Saline River bottoms, as a matter of widening the road from 30 to 52 feet. The road embankment through the bottom is 15 to 18 feet high, and the contractor had to extend the embankment 12 feet on each side. The new fill was put down in layers of 8 inches, and each layer was to be compacted to a density of 95 Proctor.[1] To obtain the proper compaction, Arnold

---

[1] This is a standard measurement of compaction.

had been using a D7 bulldozer to pull a sheepsfoot roller back and forth over the fill. Though this method would accomplish the task, the work was slow and expensive, it being impossible to turn a dozer and sheepsfoot roller around on a high, narrow fill. Accordingly, the dozer would have to be operated to a place where there was room to turn.

Arnold had heard or read about a pneumatic roller used to compact earth, which could be driven back and forth without turning it around, and he contacted Roy McDonald, an equipment dealer with whom he had done business. McDonald represented the manufacturer of the machine, Koehring Company, doing business as Buffalo-Springfield Company, appellee herein. At Arnold's request, McDonald and Frank Knolls, a factory representative for appellee, went with Arnold to the Saline River bottoms and inspected the four pits from which Arnold planned to obtain the dirt for the fill. Two of the pits were in the river bottom in gumbo mud; another was in sandy soil, and there was another in clay dirt. According to Arnold, these men assured Arnold that the PSR-30 machine (about which Arnold had inquired) would work satisfactorily, and get the required compaction. Arnold, stating that he relied upon their superior knowledge, signed a lease agreement on July 13, 1962, to rent this machine for 6 months for the sum of $1,600.00 per month, and the machine was placed on the job July 23, 1962. McDonald instructed the men how to operate the roller and demonstrated it by driving it himself.[2] Appellant placed the machine in use, and thereafter occurred the events which give rise to this litigation, and which will be subsequently discussed. Arnold, contending that the machine did not perform satisfactorily, never did actually pay but $1,600.00 for rent, turned the machine back in, and refused to make any further payments. Appellee then instituted suit for the balance of the rent due for the 6 months period against Arnold, Fairchild, and the Western Cas-

[2]The machine did not contain ballast, and turned over when he drove it near the edge of the fill.

ualty and Surety Company, which had executed a payment and performance bond as surety (for Fairchild Construction Company) to all who furnished material, labor, and supplies in doing the work under this contract. Fairchild and Western answered, admitting. the execution of the bond, but denying all other material allegations, and Arnold answered separately, asserting that the machine would not perform the work as represented by appellee; further, that he had been damaged in. the sum of $3,000.00 because the failure of the machine had delayed him in completing his contract, and his operating expense had risen because of that fact. On trial, the court, sitting as a jury, found that appellee was entitled to judgment in the amount of $7,000.00; that the Fairchild Company and Western Casualty were liable for that period of the lease agreement between July 23, 1962, and October 27, 1962 (when the machinery was being used on the Fairchild job in Grant County), in the net amount of $2,359.99;[3] that the cross-complaint of Arnold should be dismissed. From such judgment comes this. appeal.

. . .There was a no warranty clause in the lease contract, but appellant argues that this clause only warrants against latent defects in material, workmanship or capacity, and he asserts there was an implied warranty that the particular type of machine involved would obtain the compaction required. Appellant states:

"* * * The form used contains a no warranty clause but it is quite clear that the clause was not designed to relieve lessors of their obligation under the implied warranty that the machine was suitable for the use intended. The lessor and the manufacturer knew what was expected and required of the machine on this job.

It is not necessary that we discuss whether there

[3]Arnold had paid $1,600.00 in cash, and appellee had given Arnold credit for $1,000.00, because of a breakdown of the machine for 19 days. This credit was subtracted from the total sum held to be due by Western of $4,959.99.

actually was an implied warranty, for we think fact questions dispose of this litigation.

Proof on the part of appellant is to the effect that the roller would not give 95% Proctor compaction. Arnold stated that he could obtain 90, 91 and 92% Proctor compaction, but that he would then have to go back with his old machine to make the additional compaction. He said that his crew had trouble compacting the edge of the roadway, because of the fact that the machine could not get in close to the edge. Arnold mentioned that after a period of time, "the torque converter went out. * * * We were down I would say 10 days, maybe three weeks or longer, which the factory compensated us for as far as the rent was concerned. It was satisfactory how, the arrangement they made as far as that part of it was concerned."[4] Appellant testified that, in operating the roller, the directions given by McDonald were followed, that he was told "to fill it full of water. We filled it full of water. We still come up—that added more weight to it. Then they told us to put more air in the tires, on pneumatic rollers—the amount of air in the tires has something to do with the amount of compaction you get. They told us to do that. We still didn't get it. In a period of two or three weeks this same factory man came back down and he said as a last resort to get the maximum weight on this roller he said to fill it full of sand and then fill it full of water, and we did that, but we still were unable to come up to this 95 per cent Proctor compaction which was required by the State. All the time we were still having to use the sheepsfoot to get the final four or five per cent compaction, before we could put our gravel and other materials on it." Arnold took the roller off the Grant County job and sent it to Bald Knob, where he had another contract. In the meantime, he had made his rental payment on September 12. When asked why he retained the machine so long before taking it off the Saline River contract, appellant replied that he was "still in the stage of

---

[4]This was the instance in which Arnold was credited with the $1,000.00.

getting information from the factory," and he believed in giving the machine "a fair chance."

According to Randolph Reynolds, superintendent for Arnold on the Saline River job, the biggest trouble occurred on the shoulder. "Yes, where we had the biggest trouble on the shoulders. Take a Sheepsfoot and roll the shoulders because it hangs out a little further and get your compaction that way." He stated that the pneumatic roller could be used up to a certain point, but that the sheepsfoot would have to be then used in order to meet the specifications. He also said that there were times when this old machine would not attain the 95% compaction on the first trial. With the pneumatic roller, according to the witness, one could usually get the required compaction with sandy material. Reynolds said that the machine was top-heavy, and it was "difficult to find an operator that would run it. Most people was scared of it."

The roller, after being sent to Bald Knob, was never used, because of rainy conditions, and it was finally turned back to McDonald on November 9, according to appellant, at the request of McDonald.

Roy McDonald testified on behalf of appellee that his company was the authorized representative of Buffalo-Springfield in this territory, and rentals were remitted to that company; his organization would not receive compensation unless the lease agreement was carried out. He testified that he told Mr. Arnold how the machine should be operated, and also furnished appellant with literature relative to proper operation of the roller. The witness said that the machine "should have Calcium Chloride in the tires, ballast in the tires before it's ever put in operation, and I located the Goodrich people in Little Rock and they had the facilities for filling the tires, etc. He could go down that afternoon and I talked to Mr. Arnold, told him what the price was, availability, could be done that afternoon. I gave him

the man's phone number and Mr. Arnold said he would 'phone him right away and get him down there. * * * The more ballast you have in it the lower the center of gravity comes down." Mr. Arnold denied that anything was mentioned about calcium chloride, but the literature referred to is an exhibit and reflects directions for increasing the weight, mentioning five different increases respectively, caused by calcium chloride in tires, water ballast, water ballast and calcium chloride in tires, wet sand ballast, and wet sand ballast and calcium chloride in tires. McDonald said:

"* * * The book is pretty explicit if you want your maximum compaction you need to go to maximum weights and tire pressures and the only way to get that, fill that thing up with sand and water."

McDonald also testified that Arnold complained about the machine around the middle of August, but after a visit by the factory representative, who recommended that the moisture content be increased, he (McDonald) heard no further complaint until October. The witness, who denied that he had told Arnold to return the machine, also testified that there was no sand in it when it was returned. McDonald was insistent that the roller would have worked satisfactorily if the recommendations had been correctly complied with.

That, then, is the testimony. Let it be remembered that, this being a Circuit Court case, we are only concerned with whether there was substantial evidence to support the judgment of the Circuit Court. It is, at once, obvious that the testimony was rather conflicting. Arnold and his witness stated, in effect, that the pneumatic roller simply would not "do the job," and it is appellant's contention that there was an implied warranty that it would perform the task for which it was leased. As previously stated, the question of whether there was an implied warranty is not controlling, for the Circuit Court, sitting as a jury, could well have found that the reason for the failure of the machine (if it did actually

fail) was because Arnold did not comply with instructions in operating it. McDonald testified that he gave to appellant a copy of "condensed specifications" for this machine, and the specifications as to ballast condition (mentioned previously in this opinion) very clearly state that calcium chloride should be placed in the tires. Mr. Arnold testified that he did not do this, saying that he had not been told, but the fact remains that proper operating procedures are explained in the exhibit just mentioned. Arnold also testified that sand had been used to add weight, but McDonald, in his testimony, said that an examination of the machine, upon its return, showed that sand had never been placed in it. Specialized machinery, of course, must be operated in accord with directions in order to attain a high degree of efficiency. The court heard these witnesses on this question, and, apparently took the view testified to by appellee.

It also appears that, at the very least, some benefits were obtained by Arnold from the use of the machine. The pneumatic roller could be driven in both directions without the necessity of turning it around, and this designed characteristic certainly should have been an aid to appellant. In *Lawson* v. *Rusconi*, 296 Pac. 628 (Cal.), the court said:

"Assuming an implied warranty, as contended for, it would be to the effect that the device was reasonably fit for the purpose intended. The court found that the contracts were fully complied with by the respondent, and, even if an implied warranty be assumed, we think this finding is supported by the evidence. Such a warranty would not call for 100 per cent efficiency upon the part of the machine and process, but only for such results as would be reasonable under the circumstances. While certain machinery for certain purposes may closely approximate perfection in its operation, many kinds of machinery and processes are extremely valuable, and constitute a great improvement over prior methods of doing certain things, although, from the very nature of the case, perfect results are impossible. In such cases,

reasonable fitness for the purpose intended is to be judged by a comparative standard rather than by an arbitrary one.''

Arnold had the use of the machine for approximately a month before he made his first rental payment, and, though subsequently still complaining that it had not performed satisfactorily, sent it on to another job at Bald Knob, where he evidently intended to make further use of it, but was precluded from doing so by constant rain.

It is asserted that the machine was returned at the request of appellee on November 9, and Arnold could not properly be held liable for the full 6 months rental. We do not ageee. The machine was leased for that period of time. McDonald denied that he told Arnold that he had to bring it back, and stated that he had no authority to change the lease agreement. He did say that he told Arnold that appellee would have to repossess the ma-- chine and file suit for the amount of the lease if appellant did not take steps to arrange payments.

As stated, this was a case of conflicting testimony. The Circuit Court, sitting as a jury, decided these issues in favor of appellee, and there is substantial evidence to support the finding and judgment.

Affirmed.